# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00004-CV

**Charly Publishing Limited and Charly Acquisitions Limited, Appellants**

**v.**

**Evelyn Kynard Erickson, in her Capacities as Attorney-in-Fact for Roky Erickson and Trustee of the Roky Erickson Trust, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. 93-07292, HONORABLE CHARLES F. CAMPBELL JR., JUDGE PRESIDING

Appellants, Charly Publishing Limited and Charly Acquisitions Limited, appeal a discovery sanction order and the denial of appellants' special appearances. We will affirm both orders.

### BACKGROUND

In the 1960s, Austin musician Roky Erickson and his band, the 13th Floor Elevators, entered into a recording contract in Texas with Texas-based International Artists Producing Corporation ("International Artists") and a songwriter's contract with Texas-based Tapier Music Corporation ("Tapier"). The contracts granted International Artists the exclusive right to produce and distribute records and tapes of music performed by Erickson and the other band members and granted Tapier the exclusive right to license, exploit, and collect royalties in connection with songs composed by Erickson. The contracts obligated both companies to account to and pay royalties to

Erickson and the other band members. In 1978, Lelan Rogers ("Rogers"), a former employee of International Artists, bought all the outstanding shares of stock of both International Artists and Tapier, acquiring both the publishing interests and master recordings of certain 13th Floor Elevators' songs.

In 1993, Evelyn Kynard Erickson ("Erickson"), in her capacity as Attorney-in-Fact for Roky Erickson and as Trustee of the Roky Erickson Trust, filed suit in Austin, Texas, against Rogers and others seeking both damages for alleged unpaid royalties and rescission of the recording and songwriter's contracts previously entered into with International Artists and Tapier.

On April 1, 1995, with Erickson's suit proceeding, Rogers entered into a contract in California with Charly Publishing Limited ("Charly Publishing"), an English company, whereby Charly Publishing purchased the songwriter's contracts from Rogers. In the purchase agreement, Charly Publishing expressly acknowledged that it was aware of Erickson's suit against Rogers in Austin, Texas. On the same day, Charly Holdings, Inc. ("Charly Holdings"), a Panamanian company, entered into a substantially similar purchase contract with Rogers in which Charly Holdings purchased the recording contracts from Rogers.

Charly Holdings subsequently sold its interest in the 13th Floor Elevators' music to Etablissement Anfra ("Anfra") of Liechtenstein on June 1, 1995. On January 11, 1996, Anfra sold its interest in the music to Charly Acquisitions Limited ("Charly Acquisitions"), an Irish company. Erickson accordingly joined both Charly Publishing and Charly Acquisitions ("the Charly companies") in the original suit.

Erickson served process and requests for disclosures on Charly Publishing on January 27, 1999 and on Charly Acquisitions on February 4, 1999. The Charly companies filed special appearances on March 1, 1999. Erickson served both companies with requests for production on March 31, 1999 and with interrogatories on April 2, 1999. On April 29, 1999, the Charly companies requested additional time to respond to discovery. Counsel for both parties entered into a written agreement whereby the Charly companies would have until May 6, 1999 to file objections to discovery and until May 13, 1999 to produce responses to discovery.

On May 6, 1999, the Charly companies filed objections to Erickson's requests for production and interrogatories. The trial court overruled these objections at a hearing on May 17, 1999. Pursuant to Rule 193.4 of the Texas Rules of Civil Procedure, the Charly companies were required to produce responsive documents and answer all interrogatories within thirty days after the court's ruling. *See* Tex. R. Civ. P. 193.4. Erickson wrote to the Charly companies after the May 17th hearing requesting that they respond to the discovery requests. After receiving no responses, Erickson filed, on July 15, 1999, a motion to compel and a motion for sanctions. A hearing was set for August 3, 1999. On August 2, 1999, the Charly companies responded to the requests for disclosure. On August 3, the day of the hearing, the Charly companies responded to the requests for production for the first time. The companies did not respond to any of the interrogatories.

At the August 3rd hearing, the trial court ordered the Charly companies to fully and completely respond to Erickson's discovery requests, sanctioned the companies by assigning attorney's fees against them, and warned the companies that if they failed to deliver full and complete answers within ten days, the following fact would be established as true: "Defendant Charly

3

Publishing Limited and Defendant Charly Acquisitions Limited have engaged in business contacts in Texas sufficient to confer this Court with in personam jurisdiction over both Defendants in this action."

The Charly companies tendered responses to Erickson's discovery requests on August 13, 1999. Dissatisfied with the responses, Erickson filed a second motion to compel and a motion for sanctions on August 27, 1999. The second motion to compel was heard on September 21, 1999. Immediately before the hearing, counsel for both parties entered into a written agreement wherein the Charly companies agreed to answer certain discovery requests within a specified time. At the hearing, the trial court determined that the responses previously filed by the Charly companies were not full and complete as required by the previous court order. As warned, the trial court sanctioned the companies by finding as fact that both companies engaged in business contacts in Texas sufficient to confer the court with *in personam* jurisdiction. The trial court signed the order on October 6, 1999. This order formed the basis of the Charly companies' initial appeal.

On December 13, 1999, another hearing was held in which the Charly companies' special appearances were overruled. From the evidence presented at the hearing, separate from its earlier sanction, the trial court made the same factual determination: that Charly Acquisitions and Charly Publishing have business contacts in Texas sufficient to confer the court with *in personam* jurisdiction over both companies. The Charly companies now appeal the trial court's imposition of the discovery sanction, the court's denial of their special appearances, and the factual determination resulting from both actions, arguing that Charly Publishing and Charly Acquisitions do not have

business contacts in Texas sufficient to confer the court with *in personam* jurisdiction over the companies.

## DISCUSSION

Discovery sanctions are not appealable until the trial court renders a final judgment. *Bodnow Corporation v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986). However, when the trial court overruled the Charly companies' special appearances, it rendered an appealable interlocutory order. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2000). The trial court's factual determination underlying the denial of the special appearance is identical to that of the earlier discovery sanction: that the Charly companies engaged in business contacts in Texas sufficient to confer the court with *in personam* jurisdiction over the companies. Had the trial court chosen a different sanction or had the sanction encompassed another subject matter, the sanction order would not yet be appealable to this Court absent specific authorization. Further, the record makes clear that the trial court based its special appearance ruling on the evidence presented at the hearing and not on its earlier sanction. Because the factual bases of the two court orders are identical and because the court can entertain an interlocutory appeal of the special appearance order, this Court will review that portion of the discovery sanction resulting in the factual determination alongside the denial of the companies' special appearances.[1]

*Standard of Review*

---

[1] We need not decide whether determining a jurisdictional fact adverse to a litigant is an appropriate sanction in light of the trial court's finding based on an evidentiary hearing on the matter.

5

A defendant who challenges a court's exercise of personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex. 1985); *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982). When a trial court overrules a special appearance, the defendant should request the court to make findings of fact according to Texas Rule of Civil Procedure 296. *See* Tex. R. Civ. P. 296; *Runnells v. Firestone*, 746 S.W.2d 845, 848 (Tex. App.—Houston [14th Dist.] 1988, writ denied). Absent such findings, we view the trial court's judgment as impliedly finding all the necessary facts to support its ruling. *See Worford v.* Stamper, 801 S.W.2d 108, 109 (Tex. 1990). The Charly companies made no request for findings of fact from the trial court, and none were filed. We therefore presume that the trial court made all necessary findings to support its order. *See id.* If evidence supports the implied findings of fact, we must uphold the trial court's judgment on any legal theory supported by the evidence. *See id.*

When *in personam* jurisdiction is challenged, we review all the evidence. *See Smith v. Lanier*, 998 S.W.2d 324, 330 (Tex. App.—Austin 1999, pet. denied). We apply a factual sufficiency standard in reviewing the evidence, not a *de novo* review. *See id.* We may reverse the decision of the trial court only if its ruling is so against the overwhelming weight and preponderance of the evidence as to be clearly erroneous and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

*In Personam Jurisdiction*

A Texas court may exercise jurisdiction over a nonresident defendant when the Texas long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with due process. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 1997). Our long-arm statute authorizes the exercise of jurisdiction over those who do business in Texas. *Guardian Royal*, 815 S.W.2d at 226. The supreme court has determined that the broad language of the long-arm statute permits an expansive reach of jurisdiction, limited only by the federal constitutional requirements of due process. *Id*. As a result, we consider whether it is consistent with federal constitutional requirements of due process for Texas courts to assert *in personam* jurisdiction over the Charly companies. *See id.*

Under the federal constitutional test of due process, a state may assert personal jurisdiction over nonresident defendants where (1) the defendants have purposefully established "minimum contacts" with the forum state and (2) the exercise of jurisdiction comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz* , 471 U.S. 462, 475-76 (1985).

*Minimum Contacts*

The ultimate test of minimum contacts is whether the defendants purposefully availed themselves of the privilege of conducting activities in Texas, thereby invoking the benefit and protection of Texas laws. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Those activities, whether they consist of direct acts within the forum or conduct outside the forum, must justify a conclusion that the defendants should reasonably anticipate being called into Texas. *Id.*

7

Foreseeability is thus an important consideration in deciding whether the nonresident defendants have purposely established minimum contacts with the forum state. *Guardian Royal*, 815 S.W.2d at 227.

The minimum contacts analysis has further been refined into two types of jurisdiction, specific and general. Specific jurisdiction exists when the cause of action arises out of or relates to the nonresident defendants' contacts with the forum state. *Id*. The nonresident defendants' activities must have been purposefully directed toward the forum state. *Id*. at 228. Under specific jurisdiction, the minimum contacts analysis focuses on the relationship among the defendants, the forum, and the litigation. *Id*. General jurisdiction exists when the defendants' contacts with the forum state are continuous and systematic, even if the cause of action does not arise from or relate to activities conducted within Texas. *Id*. Generally, the effort to establish general jurisdiction is more demanding, requiring a showing of the defendants' substantial activities within the forum state. *Schlobohm*, 784 S.W.2d at 357. We analyze the present case under both types of jurisdiction.

The Charly companies argue that they do not have minimum contacts with Texas sufficient to subject them to *in personam* jurisdiction within the state, emphasizing that they are foreign corporations based in Ireland and the Channel Islands, and that they are not registered to do business in Texas, do not own property in Texas, have no employees, assets, or offices in Texas, and have not sought to avail themselves of the protections afforded under the laws of Texas. However, minimum contacts with a state for personal jurisdiction purposes need not always arise from actual physical activity of the defendant in the forum state. Activities taking place in other states or countries which entail foreseeable effects in the forum state may be sufficient to satisfy the minimum contacts requirement. *See Western Desert, Inc. v. Chase Resources Corp.*, 460 F. Supp. 63, 65

(N.D. Tex. 1978). The record establishes that the Charly companies engaged in numerous activities, the foreseeable effects of which satisfy the minimum contacts requirement.

Pursuant to the original recording and songwriter's contracts, International Artists and Tapier were obligated to provide notices, twice-yearly written accountings, and royalties to Erickson and other band members at their addresses in Texas. By purchasing the outstanding shares of International Artists and Tapier, Rogers assumed these obligations. When Rogers entered into the agreements with Charly Publishing and Charly Holdings, both companies signed identical contracts with Rogers. Article 6.2 of the contracts states that both Charly Publishing and Charly Holdings undertook "to fulfil all [Rogers'] obligations first arising after the date hereof pursuant to the Acquisition Agreements as if [Charly Publishing and Charly Holdings] [were] a direct party to such agreements." Under the agreement, the companies expressly assumed all responsibilities under the former contracts, including the obligation to pay royalties and make accountings. The contracts between Rogers on the one hand, and Charly Publishing and Charly Holdings on the other, also contained identical provisions obligating the companies "to pay any and all royalties due to the Assignors and all other third parties participating pursuant to the Acquisition Agreements in respect of phonograph records sold and/or any and all other exploitation of the Compan[ies] and or [their] licenses." When Charly Acquisitions subsequently assumed the contract Charly Holdings originally entered into, Charly Acquisitions became subject to the common law maxim that "an assignee stands in the shoes of his assignor." *Jackson v. Thweatt*, 883 S.W.2d 171, 174 (Tex. 1994). Charly Acquisitions thus became responsible for Charly Holdings' contractual obligations. The record also

9

reveals that the Charly companies have, in fact, sent accountings to band members located throughout Texas.

The Charly companies rely on *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760 (Tex. 1977), *cert. denied*, 434 U.S. 1063 (1978), to argue that minimum contacts may not be satisfied by a party merely making payments or sending royalties to the forum state. In that case, a Texas business, U-Anchor, installed highway signs in Oklahoma and the Oklahoma customer sent monthly payments to U-Anchor's office in Texas. *U-Anchor Adver., Inc.*, 553 S.W.2d at 761. The Texas Supreme Court held that the Oklahoma customer's single act of mailing payments to Texas was not enough to satisfy the due process requirement of minimum contacts. *Id.* at 763. If the *only* contact the Charly companies had with Erickson was sending royalty payments to Erickson in Texas, the present case might be more analogous to *U-Anchor Advertising*. However, the Charly companies had other contacts, in addition to the obligation to send royalties and accountings, that collectively satisfy the minimum contacts requirement.

Where nonresident defendants have only a single contact or activity tying them to the forum state, minimum contacts may be absent. But with each additional contact, the analysis changes. This Court has sustained a finding of sufficient minimum contacts with Texas where the nonresident defendant had two purposeful contacts. *See Rowland & Rowland, P.C. v. Texas Employers Indem. Co.*, 973 S.W.2d 432, 436 (Tex. App.—Austin 1998, no pet.). In *Rowland & Rowland*, in addition to sending a payment from a wrongful death judgment to Texas residents, the nonresident law firm sent a letter to the Texas Employers Indemnity Company confirming that the firm would protect the company's interest in continuing litigation, eliminating the necessity of the company being added to

10

the suit. *Id.* at 435-36. This Court found that the nonresident defendant's promise to protect the company's interest in Texas and the distribution of proceeds in Texas were sufficient purposeful minimum contacts with this state to satisfy due process. *Id*. at 436. As in *Rowland & Rowland*, the record here contains evidence of contacts of substantial quality to establish minimum contacts.

In addition to obligating themselves to make royalty payments and accountings to Texas residents, the Charly companies acquired the recording and songwriter's contracts knowing they were the subject matter of litigation in Texas. As successors to Rogers' interest, the Charly companies acquired that interest knowing it was subject to disputed litigation. Section 3.6 of the assignment contracts drafted by the Charly companies for Rogers states, in part:

> Company [Charly companies] is aware that proceedings have been issued against you [Rogers] by Roky Erickson and others in Austin, Texas ("the Proceedings") claiming that you do not own and/or control any rights . . . . You hereby undertake to defend the Proceedings to the best of your ability and not to settle or compromise the Proceedings without the prior written consent of Company.

The Charly companies argue that this section absolved the companies of any involvement in the lawsuit. Yet, as the parties recognize, the provision does not prohibit or protect the Charly companies from involvement in the lawsuit. Rather, it merely requires Rogers to continue defense of the action. In fact, the provision clearly states that while Rogers would remain primarily responsible for the defense, the Charly companies would nevertheless take at least an indirect interest in the lawsuit by requiring Rogers to seek the Charly companies' approval before settling or compromising the proceedings. Even if the Charly companies chose not to become directly involved in the proceedings, which the contracts did not prohibit them from doing, they nevertheless required

11

Rogers, a party involved in a lawsuit in Texas courts, to gain the approval of the Charly companies before resolving the Texas proceedings, thereby implicating the Charly companies in availing themselves of the benefits and protections of the laws and judicial system of the state.

The Charly companies have also initiated contact in Texas with Texas residents, in addition to Erickson, in attempts to settle and renegotiate the terms of the original recording and songwriter's contracts. The Charly companies hired a Houston law firm to represent them and contact former 13th Floor Elevators band members to renegotiate and confirm contract terms. Letters sent by the Houston firm offered advances against future royalties for confirmation of the Charly companies' purchase and ownership of the 13th Floor Elevators' recordings. The Charly companies also sent a solicitor representing them from Europe to Texas to enter into an agreement with Noble Ginther, a former owner of International Artists and Tapier, confirming that Ginther no longer claimed any interest in the musical rights of Erickson or the 13th Floor Elevators. In business unrelated to either Erickson or the 13th Floor Elevators, the Charly companies also have entered into contracts with other Texas musicians obligating the companies to deliver accountings and payments on a regular basis to such musicians in Texas.

The nature and quality of the Charly companies' contacts with Texas support the trial court's finding of *in personam* jurisdiction. The Charly companies knew they were assuming contracts negotiated in Texas that obligated them to send regular accountings and royalties to Texas residents. The companies were likewise aware of the litigation in Texas before they took assignment of such contracts, making it foreseeable that the companies would in some manner be involved in the ongoing litigation. The Charly companies also utilized the benefits and protections of Texas laws in

12

soliciting, negotiating, and entering into agreements in Texas. We find it difficult to understand how, given the evidence of such contacts, the Charly companies can assert they have taken no action directed toward the forum state. We therefore hold that the Charly companies' contacts with Texas satisfy the minimum contacts test of due process. Having determined that the trial court's exercise of jurisdiction in these circumstances withstands a minimum contacts analysis, we next determine whether this exercise comports with fair play and substantial justice.

*Fair Play and Substantial Justice*

Because the minimum contacts analysis includes many considerations of fairness, once sufficient contacts are established the likelihood that the exercise of jurisdiction violates a fair play analysis lessens. *See Schlobohm*, 784 S.W.2d at 357-58. We nevertheless consider the fair play analysis because case law makes clear that it constitutes a separate and distinct issue from minimum contacts. *See id.* at 358. In determining whether the assertion of personal jurisdiction comports with fair play and substantial justice, we evaluate the nonresident defendants' contacts in light of other factors, including (1) the burden on the defendants, (2) the interest of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Guardian Royal*, 815 S.W.2d at 228 (citing *Burger King*, 471 U.S. at 477). The defendant assumes the burden to show "a compelling case that the presence of some consideration would render jurisdiction unreasonable." *Id.* at 231.

13

Evidence relating to the factors for determining whether assertion of personal jurisdiction over a nonresident defendant is fair and reasonable weighs against the Charly companies. First, nothing in the record indicates that defending an action in Texas will unduly burden the Charly companies. Distance alone is not ordinarily sufficient to defeat jurisdiction. *Id*. Over time, the Charly companies have sent at least one representative from England to Texas and hired a Texas lawyer to engage in other contract negotiations; they have not demonstrated that defending this action would be unduly more burdensome. Second, Texas has an interest in adjudicating the dispute because the original contracts were executed here, the action was originally filed here, and the laws of Texas will apply to the contracts' interpretation. Third, as Texas residents, Roky Erickson and his mother, as Attorney-in-Fact, can obtain the most convenient and efficient relief in Texas. Considering all of the above factors, we conclude that requiring the Charly companies to submit to the jurisdiction of Texas courts does not offend traditional notions of fair play and substantial justice.

## CONCLUSION

Having determined that the Charly companies established minimum contacts with Texas and that the assertion of jurisdiction comports with fair play and substantial justice, we overrule the Charly companies' points of error and affirm the trial court's discovery sanction and denial of the Charly companies' special appearances.

Marilyn Aboussie, Chief Justice

14

Before Chief Justice Aboussie, Justices B. A. Smith and Patterson

Affirmed

Filed:   October 5, 2000

Do Not Publish